AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of California

FILED

DEC 1 8 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )    Case No.
                                                   )
Facebook, Inc., 1601 Willow Road, Menlo Park, CA   )    **19MJ5639**
94025 (Facebook ID 100019846267598)                )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Conspiracy to import controlled substances; |

The application is based on these facts:

See attached Affidavit of Special Agent Matthew Steuernagel

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Matthew Steuernagel, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12/18/19

_____
*Judge's signature*

City and state:  San Diego, CA                    Hon. Michael S. Berg
                                                  *Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Steuernagel, Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

### INTRODUCTION

1. This affidavit is in support of an application by the United States of America for a search warrant for Facebook, Inc. ("Facebook"), as described in Attachment A, to search the following Facebook account for items that constitutes evidence, fruits and instrumentalities of violations of federal criminal law, namely, 21 U.S.C. §§ 952, 960, and 963, as described in Attachment B:

> Facebook Name: "Erika Quijada"
> Facebook ID No.: 100019846267598
> Facebook URL: www.facebook.com/erika.quijada.520
> (hereinafter, "**Target Account**"),

utilized by Erika Jasmin RAMIREZ between July 17, 2019 and October 19, 2019.

2. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the **Target Account**. The information contained in this affidavit is based upon my experience and training, and in consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant as described herein, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

//
//
//

## EXPERIENCE AND TRAINING

3.     I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by ICE/HSI as a Special Agent since November 2018. Prior to becoming a Special Agent, I served as a Federal Air Marshal with the Federal Air Marshal Service from 2009 to 2018. I also served as a Parole Officer with the Ohio Adult Parole Authority from 2005 to 2008.

4.     I earned a dual Bachelor of Arts degree in Criminal Justice Studies and Applied Conflict Management from Kent State University in 2002. Additionally, I earned a Master of Arts degree in National Security and Strategic Studies from the United States Naval War College in 2018.

5.     As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, Title 19 and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border.

6.     I have completed and graduated from the twelve-week Criminal Investigator Training Program as well as the fifteen-week Homeland Security Investigations Special Agent Training Program located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. I have completed and graduated the Federal Air Marshal Training Program ("FAMTP") Phase I, located at the FLETC in Artesia, New Mexico, and FAMTP Phase II, located the Federal Aviation Administration's William J. Hughes Technical Center in Egg Harbor Township, New Jersey. I have also completed the Ohio Department of Rehabilitation and Corrections' Basic Training Program and Parole Officer Training Program, located in Orient, Ohio.

7.     Since June of 2019, I have been assigned to a HSI Contraband Smuggling Group in San Ysidro, California. My duties include investigating the illicit trafficking of controlled substances into the United States. During my assignment to the Contraband Smuggling Group, I have participated in the investigation of drug trafficking organizations

1  involved in the acquisition, importation, transportation, and distribution of controlled
2  substances into and through the Southern District of California.

3      8.    In the course of my duties, I have been a case agent directing drug-related
4  investigations. I have participated in many aspects of criminal investigations including
5  reviewing evidence and conducting physical and electronic surveillance. I have interviewed
6  defendants while conducting various investigations. I have gained a working knowledge
7  and insight into the normal operational habits of narcotics traffickers, with particular
8  emphasis on those who attempt to import narcotics into the United States from Mexico at
9  the San Diego international ports of entry.

10      9.    Through the course of my training, investigations, and conversations with
11  other law enforcement personnel, I am aware that it is a common practice for narcotics
12  smugglers to work in concert with other individuals and to do so by utilizing cellular
13  telephones, pagers, portable radios and GPS devices to maintain communication and
14  location information with co-conspirators in order to further their criminal activities. This
15  is particularly true in cases involving distribution amount quantities of controlled
16  substances, such as methamphetamine. Typically, load drivers smuggling controlled
17  substances across the border are in telephonic contact with co-conspirators immediately
18  prior to, during and following the crossing of the narcotic load, at which time they receive
19  instructions on how to cross and where and when to deliver the controlled substance.
20  Narcotics smugglers and their organizations use cellular, digital, and satellite telephones, in
21  part, because these individuals believe law enforcement is unable to track the originating
22  and destination phone numbers of calls placed to and from cellular, digital, and satellite
23  telephones.

24      10.    In preparing this affidavit, I have conferred with other agents and law
25  enforcement personnel who are experienced in the area of narcotics investigations, and the
26  opinions stated below are shared by them. Further, I have personal knowledge of the
27  following facts, or have had them related to me by persons mentioned in this affidavit.
28

**FACEBOOK, INC.**

11.   Facebook, Inc. is an Internet company which, among other things, provides electronic communication services to its subscribers. Facebook's electronic mail/communication service allows Facebook subscribers to communicate and share with other Facebook subscribers and with others through the Internet. Facebook subscribers access Facebook's services through the Internet.

12.   Subscribers to Facebook use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Facebook requires users to subscribe for a free Facebook account, Facebook does not verify the information provided by the Facebook subscriber for its free services.

13.   At the creation of a Facebook account and for each subsequent access to the account, Facebook logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

14.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

15.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval),

4

physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

16.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which

1  is a space where the user and his or her "Friends" can post messages, attachments, and links
2  that will typically be visible to anyone who can view the user's profile.

3       19.    Facebook allows users to upload photos and videos, which may include any
4  metadata such as location that the user transmitted when s/he uploaded the photo or video.
5  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or
6  video. When a user is tagged in a photo or video, he or she receives a notification of the tag
7  and a link to see the photo or video. For Facebook's purposes, the photos and videos
8  associated with a user's account will include all photos and videos uploaded by that user
9  that have not been deleted, as well as all photos and videos uploaded by any user that have
10  that user tagged in them.

11       20.    Facebook users can exchange private messages on Facebook with other users.
12  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox"
13  on Facebook, which also stores copies of messages sent by the recipient, as well as other
14  information. Facebook users can also post comments on the Facebook profiles of other users
15  or on their own profiles; such comments are typically associated with a specific posting or
16  item on the profile. In addition, Facebook has a Chat feature that allows users to send and
17  receive instant messages through Facebook. These chat communications are stored in the
18  chat history for the account. Facebook also has a Video Calling feature, and although
19  Facebook does not record the calls themselves, it does keep records of the date of each call.

20       21.    If a Facebook user does not want to interact with another user on Facebook,
21  the first user can "block" the second user from seeing his or her account.

22       22.    Facebook has a "like" feature that allows users to give positive feedback or
23  connect to particular pages. Facebook users can "like" Facebook posts or updates, as well
24  as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can
25  also become "fans" of particular Facebook pages.

26       23.    Facebook has a search function that enables its users to search Facebook for
27  keywords, usernames, or pages, among other things.

28

24.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

26.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

27.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

28.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

29.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future

7

and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

30.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

31.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

32.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used

1   or controlled the Facebook account at a relevant time. Further, Facebook account activity
2   can show how and when the account was accessed or used. For example, as described
3   herein, Facebook logs the Internet Protocol (IP) addresses from which users access their
4   accounts along with the time and date. By determining the physical location associated with
5   the logged IP addresses, investigators can understand the chronological and geographic
6   context of the account access and use relating to the crime under investigation. Such
7   information allows investigators to understand the geographic and chronological context of
8   Facebook access, use, and events relating to the crime under investigation. Additionally,
9   Facebook builds geo-location into some of its services. Geo-location allows, for example,
10  users to "tag" their location in posts and Facebook "friends" to locate each other. This
11  geographic and timeline information may tend to either inculpate or exculpate the Facebook
12  account owner. Last, Facebook account activity may provide relevant insight into the
13  Facebook account owner's state of mind as it relates to the offense under investigation. For
14  example, information on the Facebook account may indicate the owner's motive and intent
15  to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness
16  of guilt (e.g., deleting account information in an effort to conceal evidence from law
17  enforcement).

18      33.    Therefore, the computers of Facebook are likely to contain all the material
19  described above, including stored electronic communications and information concerning
20  subscribers and their use of Facebook, such as account access information, transaction
21  information, and other account information.

22      34.    Moreover, Facebook users that are not friends are generally not precluded from
23  communicating with one another. Depending on a user's specific settings, certain aspects
24  of a Facebook profile may be publicly viewable, while other portions may be restricted to
25  certain persons or friends of the Facebook user's accounts. These so-called "privacy"
26  settings are set by each individual user. Based on my experience, not every Facebook
27  account is by default restricted from public access. And while users can post messages and
28  comments on other users' Facebook pages, Facebook also allows a private messaging

function wherein messages are shared only between the users that are part of that conversation or messaging thread.

35. Based on my training and experience, Facebook Messenger is a cellphone app created by Facebook, Inc. to enable text-based and audio communications between Facebook users. Facebook users utilize their Facebook logins to access their accounts and to communicate with their Facebook friends or other Facebook users much the same way a Facebook user can communicate with other users on the Facebook website.

## JURISDICTION

36. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

**A.   Erika RAMIREZ's Arrest**

37. On October 19, 2019, at approximately 0:10 a.m., Customs and Border Protection ("CBP") Officer E. Franco was conducting pre-primary roving operations at the San Ysidro Port of Entry when his assigned Narcotics Human Detector Dog (NHDD) "Junga" alerted to a trained narcotic odor at the rear passenger door seam of a white Dodge Journey with California license plate 8KCB363 in vehicle lane 19 ("the vehicle"). Erika Jasmin RAMIREZ ("RAMIREZ"), a United States citizen, was the driver, sole occupant, and registered owner of the vehicle. CBPO M. Rice responded and escorted the vehicle to the secondary lot for further inspection.

38. CBPO M. Rice asked RAMIREZ where she was coming from and what her destination was. RAMIREZ replied she went to Tijuana to drop off a friend, and that she was going to Beyer Boulevard in San Ysidro, California. RAMIREZ confirmed she was the registered owner of the vehicle.

39. The vehicle was driven through the Z Portal and no anomalies were noted. CBPO Rice opened the driver side door and noticed a black handgun, later identified as an

10

1 | airsoft gun, in the pocket of the driver's door. RAMIREZ was removed from the vehicle,
2 | handcuffed, and escorted to the security office.

3 |     40.    CBPO V. Tovar conducted a further inspection of the vehicle and discovered
4 | a black cloth bag under the passenger front seat. There was a hard object inside the bag.
5 | CBPO Tovar opened the bag and saw a red fire extinguisher. CBPO Tovar shook the fire
6 | extinguisher, and it made a rattling sound not consistent with a normal fire extinguisher, as
7 | if there were rocks or sand inside. CBPOs ran the fire extinguisher through the X-Ray but
8 | results were inconclusive.

9 |     41.    CBPO Tovar then attempted to deploy the fire extinguisher, but it did not
10 | release any fire retardant. CBPOs tried to open the fire extinguisher but the nozzle was
11 | overly tight and appeared glued shut. Using tools, CBPOs eventually opened the fire
12 | extinguisher and observed a plug glued into the top. CBPOs punched a hole in the cap and
13 | saw clear plastic bags inside. Officers removed multiple empty bags and one bag with a
14 | white powdery substance that tested positive from properties of methamphetamine. The
15 | total weight of methamphetamine was 1.26 kilograms.

16 |     42.    Officers placed RAMIREZ under arrest for violating Title 21 United States
17 | Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance. RAMIREZ
18 | is charged with importation of a controlled substance (methamphetamine) in violation of
19 | Title 21, United States Code sections 952 and 960 in the Southern District of California in
20 | case number 19cr4580-DMS. A trial in this case is set for March 2, 2020, in front of the
21 | Honorable Dana M. Sabraw.

22 | **B.**   **RAMIREZ's Statement**

23 |     43.    On October 19, 2019, at approximately 4:29 a.m., RAMIREZ was advised of
24 | her *Miranda* rights and elected to make a statement. RAMIREZ stated that she lives in San
25 | Diego and is currently unemployed. RAMIREZ confirmed that the white Dodge Journey
26 | is her vehicle, and that she owned it since approximately February of last year.

27 |     44.    RAMIREZ claimed she crossed into Mexico at the Otay Mesa POE driving the
28 | vehicle at approximately 9:00 p.m. on October 18, 2019, to give a ride to her neighbor,

Maria Fernandez Pena. RAMIREZ said that Fernandez lives in an apartment complex down the street from her in San Diego. According to RAMIREZ, Fernandez did not feel well and needed a ride to her boyfriend's house in Tijuana. Fernandez's boyfriend's name is "Louis," but RAMIREZ does not know his last name.

45.     RAMIREZ claimed she does not know where Louis lives, but she drove Fernandez to Louis's house based on directions Fernandez provided. Once they arrived, RAMIREZ went inside to use the restroom. A relative of Louis's, "Jose Gomez," asked her for a ride to the border, and RAMIREZ agreed. She claimed she did not recall if Gomez was carrying a bag. RAMIREZ dropped off Gomez on the Mexican side of the San Ysidro POE near a big ball-shaped monument.

46.     Agents asked RAMIREZ where the fire extinguisher came from. RAMIREZ responded that she did not know there were drugs in the vehicle until the agents told her. Agents pointed out that they did not say the drugs were found inside the fire extinguisher. RAMIREZ claimed she had never seen the fire extinguisher before, and did not know where it came from. RAMIREZ claimed Fernandez put cookies in her car while she was using the restroom.

47.     Agents asked RAMIREZ for Fernandez's phone number. RAMIREZ claimed she did not remember it, but that it was in her phone. She scrolled through her contacts in the cell phone and then stated she was unable to find it.

48.     RAMIREZ said that she "never crossed to TJ much." She claimed the last time she went to Mexico was to visit her family in September 2019, and that she crossed in Nogales, Arizona.

**C.     Crossing History**

49.     A copy of the California DMV registration found in the vehicle at the time of arrest lists Erika RAMIREZ as the registered owner of the 2018 Dodge vehicle. The registration was issued on March 28, 2019. A review of RAMIREZ's crossing history in the smuggling vehicle indicates that she had approximately 10 crossings in the same vehicle before her arrest on October 19, 2019. RAMIREZ crossed on the following days:

| Date | Port | Manner |
|------|------|--------|
| May 6, 2019 | Nogales, AZ | 2018 Dodge |
| May 7, 2019 | Nogales, AZ | *pedestrian* |
| June 15, 2019 | Nogales, AZ | 2018 Dodge |
| June 16, 2019 | Nogales, AZ | 2018 Dodge |
| July 17, 2019 | San Ysidro, CA | 2018 Dodge |
| September 7, 2019 | San Ysidro, CA | 2018 Dodge |
| September 15, 2019 | San Ysidro | *2015 Volkswagen* |
| September 22, 2019 | Nogales, AZ | 2018 Dodge |
| September 23, 2019 | Nogales, AZ | 2018 Dodge |
| September 26, 2019 | Nogales, AZ | 2018 Dodge |
| September 27, 2019 | Nogales, AZ | *pedestrian* |
| September 28, 2019 | Nogales, AZ | 2018 Dodge |
| September 29, 2019 | Nogales, AZ | 2018 Dodge |

50.     RAMIREZ's crossing history indicates crossings at San Ysidro in July and September 2019. Notably, her 2018 Dodge crossed into Mexico via Otay Mesa POE on July 16, 2019, at 4:56 p.m. Approximately eight hours later, on July 17 at 00:52 a.m., RAMIREZ drove it back into the United States via the San Ysidro POE. She was the sole occupant of the vehicle during that crossing.

51.     Similarly, on September 6, 2019, the Dodge went to Mexico via San Ysidro at 11:31 p.m. Less than an hour later, at 00:18 a.m. on September 7, RAMIREZ alone drove it back into the United States through the San Ysidro POE. On September 15, 2019, at 3:50 a.m., RAMIREZ also crossed from Mexico at San Ysidro in a different vehicle, a 2015 Volkswagen. There were two more occupants in the car.

52.     RAMIREZ claimed that the she went to Tijuana on the evening of October 18, 2019, because her neighbor, Maria Fernandez, was not feeling well and needed a ride. RAMIREZ provided her address as 3823 Fruitland Place, San Ysidro, CA, and stated that Maria Fernandez lives down the street. I have since identified a Maria Fernandez with an address 3835 Fruitland Place, San Ysidro, CA. On October 19, 2019, the day of RAMIREZ's arrest, the two women crossed arrived at the San Ysidro POE within minutes of each other: Fernandez crossed as a pedestrian at 00:14 a.m., while RAMIREZ arrived at the primary vehicle lane around 00:17 a.m.

13

**D.    Maria Fernandez's Interview**

53.    On December 11, 2019, I interviewed Maria Fernandez at the San Ysidro Port of Entry.  Fernandez acknowledged she has known Erika RAMIREZ for eight or nine years, and that RAMIREZ was her neighbor.  She stated that she communicates with RAMIREZ by cellular phone using Facebook Messenger and WhatsApp.  Fernandez told agents that her phone number is 619-386-0580.

54.    Fernandez stated that she lives in the same apartment complex as RAMIREZ, and they also participate in a "cundina" together.  Fernandez explained that a cundina is a way of helping each other out.  Fernandez stated ten people participate in their cundina. Each person puts in $100 dollars per month and one person will receive $1000 dollars each month.

55.    Fernandez stated that three or four days prior to RAMIREZ's arrest, RAMIREZ gave Fernandez a ride to the hospital in Chula Vista, California (Scripps Mercy Hospital). Fernandez went to the emergency room for care and RAMIREZ waited with her while she was there. Fernandez stated she was suffering from pre-stroke symptoms.  Three days later, Fernandez was still feeling bad and asked RAMIREZ for a ride to her boyfriend's house in Tijuana, Mexico. Fernandez stated she needed a ride because she could not drive due to her illness affecting her vision. Fernandez's boyfriend is Luis Corral, and he lives in Colina De California, Tijuana, Mexico.

56.    Fernandez stated that on October 18, 2019, she called RAMIREZ sometime between 9:00 PM and 10:00 PM to ask for a ride to Corral's house in Tijuana, Mexico. RAMIREZ told Fernandez that she needed to go to Tijuana to get candy anyway.  Fernandez and RAMIREZ entered Mexico through the San Ysidro Port of Entry.  Fernandez stated it took approximately fifteen minutes to get from San Ysidro to Corral's house in Tijuana. When they arrived at Corral's house, RAMIREZ came inside to use the restroom. RAMIREZ remained at Corral's house for approximately fifteen minutes, maybe less. Fernandez stated RAMIREZ was only there long enough to use the restroom.

57.   RAMIREZ told Fernandez that she needed to go buy candy.  Fernandez stated RAMIREZ needed candy to fill a piñata for a party that was coming up. After RAMIREZ used the restroom, RAMIREZ left Corral's house.  Fernandez stated that there was no one else at the house besides Fernandez, RAMIREZ and Corral. According to Fernandez, RAMIREZ left the house by herself.

**E.    RAMIREZ's Cell Phone**

58.   At the time of her arrest, RAMIREZ was in possession of a Motorola Moto Z Force cellular phone.  Officers seized the phone incident to her arrest.  On November 27, 2019, I applied for, and Magistrate Judge Jill Burkhardt signed a warrant authorizing to the search of RAMIREZ's phone from July 17, 2019 to October 19, 2019. *See* 19MJ5307.

59.   RAMIREZ's phone was forensically downloaded on December 9, 2019.   The forensic extraction revealed that the phone number associated with the device is 619-382-4356, and also the Whatsapp account used on this device and associated with the same phone number (i.e. 16193824356@whatsapp.net).   On October 18, 2019, at 10:30 p.m., RAMIREZ   sent   a   Whatsapp   message   in   Spanish   to   "Maria"   at 16193860580@whatsapp.net,[1] telling her "I'll come pick you up in 15 min." Maria responded "ok," and 38 minutes later, at 11:08 p.m., messaged asking, "Erika, you coming." Two minutes later, at 11:10 p.m., RAMIREZ sent Fernandez a voice message via Whatsapp. RAMIREZ later deleted these Whatsapp messages she exchanged with Fernandez from her phone.

60.   RAMIREZ's phone download shows her phone was associated with a Facebook account under the name "Erika Quijada[2]," with Username "erika.quijada.520," and Facebook ID 100019846267598 (the "**Target Account**").  RAMIREZ's phone contacts include more than 500 Facebook contacts.  It appears that RAMIREZ used the Facebook

---

[1] During the interview in December 2019, Fernandez confirmed her phone number is 619-386-0580, but claimed she did not have any messages from RAMIREZ because Fernandez deletes them.

[2] A search of law enforcement databases revealed that Erika RAMIREZ previously used the last name "Quijada."

1   Messenger application to communicate with several individuals on the evening of October
2   18, 2019, the night before her arrest.  Between 9 and 9:15 p.m. (around the time RAMIREZ
3   and Fernandez claimed they went to Tijuana), RAMIREZ exchanged approximately 14
4   audio messages via Facebook Messenger with a contact named "Blanca Herrera."  Although
5   the forensic extraction shows the audio messages were sent and received, the audio files
6   were not recovered in the current download, and the content of the messages is unavailable.

7   61.   Additionally, on the same evening at approximately 8:51 p.m., RAMIREZ
8   received a Facebook message from a contact saved as "Daboss Daboss," asking her "Whts
9   blancas Facebook."  RAMIREZ replied with an image attachment (the contents of the image
10   were not recovered in the current download).  At 11:29 p.m. on the same night, Daboss
11   Daboss messaged asking "Where r u."  RAMIREZ did not respond, and at 11:41 p.m.,
12   "Daboss Daboss" unsuccessfully called her via Facebook Messenger.  At 11:47 p.m.,
13   RAMIREZ wrote back, "Went with my friend in the corner" and "To give her a ride."

14   62.   Based upon my experience investigating narcotics traffickers and the particular
15   investigation in this case, I believe RAMIREZ and other co-conspirators were engaged in a
16   conspiracy to smuggle narcotics into the United States from Mexico.  I also believe the co-
17   conspirators, including RAMIREZ, used cellular phones to communicate and coordinate
18   the importation of narcotics.  Specifically, I believe that RAMIREZ used the Facebook
19   application installed on the cellular phone seized from her at the time of her arrest to
20   communicate with her co-conspirators about the drug smuggling activities.  As indicated
21   above, although the phone review shows the date, time, and type of the Facebook messages
22   sent or received (i.e. text or audio), the current download was not able to recover all the data
23   from Facebook Messenger.  Based on the phone review, there is additional data that may
24   exist and be available in Facebook Messenger, such as audio messages, photos, videos,
25   locations, contacts, and attached files, which could reveal communications relevant to this
26   investigation.

27   63.   I know that narcotics trafficking activities entail intricate planning to
28   successfully evade detection by law enforcement.  This planning often includes

16

coordination on crossing the border to develop a crossing history or pattern. In my professional experience, narcotics trafficking activities involve planning and coordination in the weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their cargo.

64. In this case, RAMIREZ is the registered owner of the vehicle and first crossed in it from Mexico into the United States on May 6, 2019. She had approximately 9 more crossings until the day of her arrest on October 19, 2019. RAMIREZ crossed in the vehicle at San Ysidro in July and September 2019. Notably, it appears she took short trips to Mexico on July 16 (eight hours) and September 6 (less than an hour). The drugs were concealed in a fire extinguisher hidden in a bag under the passenger seat.

65. Additionally, RAMIREZ and Maria Fernandez provided inconsistent stories about RAMIREZ's trip to Tijuana. RAMIREZ deleted her Whatsapp communications with Fernandez from October 18, 2019. Yet, both women appear to have coordinated crossings from Mexico on the date of RAMIREZ's arrest, October 19, 2019: Fernandez crossed as a pedestrian at 00:14 a.m., while RAMIREZ arrived at the primary vehicle lane around 00:17 a.m.

66. As stated above, a forensic download of RAMIREZ's phone shows messages RAMIREZ received and sent from the **Target Account** on the night of her arrest. RAMIREZ exchanged approximately 14 audio messages via Facebook Messenger with a contact named "Blanca Herrera" between 9 p.m. and 9:15 p.m. on October 18, 2019. At 11:47 p.m., she used Facebook to communicate with a contact saved as "Daboss Daboss." Additionally, "Daboss Daboss" asked RAMIREZ to provide Blanca's Facebook information. The current download of the phone did not recover the contents of the audio messages or attachments. Based on my training, experience, and this investigation, I believe other communications between RAMIREZ and other co-conspirators may exist in the **Target account**.

67.     Additionally, it is believed that the records are still available to Facebook as a request to preserve **Target Account** was made under 18 U.S.C. § 2703(f).

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

68.     The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

69.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

70.     Therefore, I request authority to seize all content, including profile contact information, mini-feed, status update history, shares, notes, wall postings, friend listing with friend's Facebook ID, group listing with Facebook Group ID, future and past events, and video listings with filename; User Photos (referred to as User Photoprint); Geo-tags; Group Information; Private Messages; IP Logs; and any other content from the Facebook accounts, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachments B-1 and B-2. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

71.     Analyzing the data to be provided by Facebook requires special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

72.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

73.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

74.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//

19

1

## CONCLUSION

2      75.    Based on all of the facts and circumstances described above, I submit that there

3  is probable cause to believe that the items identified in Attachment B have been used in the

4  commission of a crime and constitute evidence, fruits, and instrumentalities of violations of

5  21 U.S.C. §§ 952, 960 and 963, and that the foregoing will be found on the premises

6  searched, as identified in Attachment A.

7

8      I swear the foregoing is true and correct to the best of my knowledge and belief.

9

10                                          Matthew Steuernagel

11                                          Special Agent

12  Subscribed and sworn to me before this ___ 8 ___ day of December, 2019.

13

14

15  The Honorable Michael S. Berg

    United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

PROPERTY TO BE SEARCHED

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and date located at Facebook, Inc., Attn: Security Department/Custodian of Records, 1601 Willow Road, Menlo Park, California 94025.

## ATTACHMENT B
### ITEMS TO BE SEIZED

**I.**     Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II**.    Items to be provided by the ISP

All subscriber and/or user information, all electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name:

> Facebook Name:  "Erika Quijada"
> Facebook ID No.:  100019846267598
> Facebook URL:  www.facebook.com/erika.quijada.520

**III**.   The search of the data supplied by Facebook, Inc. pursuant to this warrant will be conducted by Homeland Security Investigations as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of July 17, 2019 and October 19, 2019 and to the seizure of:

a.     Communications, records, and attachments tending to discuss or establish importation or distribution of controlled substances, or conspiracies or agreements to do so;

b.     Communications, records, and attachments tending to identify locations of narcotics being distributed or imported into the United States;

c.     Communications, records, and attachments tending to identify Blanca Herrera, Daboss Daboss, and any co-conspirators involved in the activities in III(a)-(b) above; and

d.     Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

which are evidence of violations of 21 U.S.C. §§ 952, 960 and 963.